UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| BEACON INVESTMENTS LLC, et al., | ) ) ) | |
| Appellants, | ) ) | |
| v. | ) ) | 2:11-cv-00204-JAW |
| MAINEPCS, LLC, et al. | ) ) | |
| Appellees. | ) ) | |

## ORDER ON BANKRUPTCY APPEAL

Secured creditors of a bankrupt debtor business challenge on appeal the Bankruptcy Court's approval of the settlement of pending litigation between the bankrupt business and a competitor.  This Court concludes that the Bankruptcy Court's approval did not abuse its discretion, that the appellants waived the right to assert that the Bankruptcy Court should have applied the "entire fairness" standard but that even if it had done so the result would have been the same, and that two of the three members of the business had the authority to enter into the settlement agreement.

## I.    STATEMENT OF FACTS

### A.    Procedural History

On May 18, 2011, Beacon Investments LLC and United Express Wireless, Inc. (collectively Beacon)[1] filed an appeal pursuant to 28 U.S.C. § 158 from the

---

[1] The Court refers to Beacon and United Express as Beacon unless the context requires otherwise.

March 30, 2011 Order of the United States Bankruptcy Court for the District of Maine granting and approving MainePCS LLC's application to compromise claims and to limit notice. *Notice of Appeal* (Docket # 1). On June 10, 2011, Beacon filed its brief in support of the appeal. *Br. of the Appellants* (Docket # 8). On June 24, 2011, the Appellees Northeast Wireless Networks, LLC and Robert J. Parsloe (collectively *NEWN*)[2] filed their response. *Br. of Appellees Northeast Wireless Networks, LLC and Robert J. Parsloe* (Docket # 10) (*NEWN Opp'n*). On July 8, 2011, Beacon filed its reply. *Reply Br. of Appellants* (Docket # 12) (*Beacon Reply*).[3] On February 24, 2012, without objection by MainePCS, Beacon filed a corrected brief and record after the Court struggled with correlating the citations in Beacon's original brief with the record. *Br. of Appellants* (Docket # 14) (*Beacon Br.*).[4]

### B.   The Bankruptcy Court Proceedings

#### 1.   The Parties

Founded in 2004 under the laws of Delaware by Robert J. Parsloe, Alex C. Tilt, and Thomas J. Barrette, Jr., MainePCS is a limited liability wireless telecommunications company whose business has been to develop and deploy a

---

[2] The Court refers to Northeast Wireless Networks, LLC and Mr. Parsloe as NEWN unless the context requires otherwise.

[3] The appeal was held in abeyance by the filing of a separate but related matter, *Beacon Invs. LLC v. MainePCS LLC*, Docket No. 2:11-cv-420-JAW; however, on February 3, 2012, the parties in that action suggested that the Court should act on this appeal.

[4] The Court's record citations are to the NEWN and re-filed Beacon appendices (*Beacon App.* at __; *NEWN App.* at __).

wireless telecommunications network in northern New England and elsewhere. *Beacon App.* at 8, 51; *NEWN App.* at 145.[5]

Beacon Investments, LLC and United Express, Inc. are two of MainePCS's primary prepetition secured lenders. *Beacon App.* at 162-63. Beacon is owned by the Allen B. Salmasi family and United is owned by Mr. Salmasi's brother-in-law and his extended family. *Id.* Between 2006 and 2007, Beacon and United loaned over $7,000,000 to MainePCS.[6] *Beacon App.* at 38; *NEWN App.* at 162-63.

Maxton Technology, Inc. (Maxton) is a company that focuses on providing specialized engineering and construction services to wireless service providers and major equipment suppliers in the telecommunications industry. *Beacon App.* at 242. Kevin Cunningham owns or controls Maxton.[7] *Beacon App.* at 52; *NEWN Opp'n* at 3.

Northeast Wireless Networks, LLC (NEWN), another telecommunications company, was formed by Robert J. Parsloe after August 31, 2009 following his termination from the MainePCS Board. *Beacon App.* at 208; *NEWN App.* at 242.

---

[5] The Appellants and the Appellees each filed an appendix to their briefs. The contents are similar. In general, when citing a fact proposed by Beacon, the Court used the Beacon appendix and when citing a fact proposed by NEWN, the Court used NEWN's appendix. The citations in the Beacon appendix are to the Bates numbering system on the documents; the citations in the NEWN appendix are denominated App. ___ at the bottom of each page.

As authority, Beacon cited in part the allegations in the Complaint that NEWN filed in Bankruptcy Court. *Beacon App.* at 51. The Court does not reach whether allegations in a pleading may substitute for evidence because NEWN separately asserted the same facts.

[6] According to MainePCS's Second Amended Plan of Reorganization dated June 22, 2010, Beacon and United held $2,349,750 in "Senior Secured Notes" and $4,956,504 in unsecured claims called "Senior Secured Deficiency Claims." *Beacon App.* at 38.

[7] As authority, Beacon cited in part the allegations in the Complaint that NEWN filed in Bankruptcy Court. *Beacon App.* at 52. The Court does not reach whether allegations in a pleading may substitute for evidence because NEWN separately asserted the same facts in its opposition. *NEWN Opp'n* at 3.

3

### 2.    MainePCS:  Background

In December 2005, MainePCS acquired Federal Communications Commission (FCC)-issued spectrum licenses from a third party covering over 750,000 people residing in 12 of the 16 counties in Maine and developed a business plan to deploy a mobile voice and data network for subscribers in its licensed territory in Maine.  *Beacon App.* at 12.  Beginning August 2007, MainePCS worked with mobile service providers to design a wholesale network to meet their needs in northern New England, which resulted in, among other things, MainePCS entering into a favorable wholesale arrangement and a lease agreement with T-Mobile USA (TMO) for its FCC-licensed spectrum in New Hampshire and Vermont.  *Id.* at 13. In 2008, MainePCS entered into a number of contracts (Contracts) with TMO or its affiliates for the purchase of broadband spectrum and lease of license rights to spectrum in Maine and Oregon.  *Id.*; *NEWN App.* at 351-78.  The TMO contract for Maine was a critical part of MainePCS's business plan.  *NEWN App.* at 25, 30.  By the latter half of 2009, despite considerable efforts to raise capital, MainePCS did not have the financial wherewithal to perform under the agreement.  *NEWN App.* at 219, 235.  In October 2009, TMO terminated two of its contracts with MainePCS, including the Maine license purchase agreement and on October 29, 2009, NEWN entered into a contract with an affiliate of TMO containing terms similar to those in MainePCS's terminated contract with the same affiliate.  *NEWN App.* at 219, 242.

Beginning 2005, Mr. Parsloe served as the president and CEO of MainePCS.[8] *Beacon App.* at 52, 208.   From 2004 to August 2010, Mr. Barrette served as MainePCS's executive vice president, chief administrative officer, and general counsel. *Id.* 52, 206-07.   At some point, Kevin Cunningham and Maxton acquired membership interests in MainePCS. *NEWN App.* at 282.   In December 2008, Mr. Cunningham became a member of MainePCS's board.[9] *Beacon App.* at 207-08.   In 2008, Messrs. Cunningham, Barrette, and Parsloe were the only members of MainePCS's board with Messrs. Parsloe and Barrette acting as MainePCS's senior officers. *Id.* at 52, 206-08.   As of June 2009, the members of MainePCS were (1) Robert J. Parsloe, (2) Thomas Barrette, (3) Kevin Cunningham, (4) Maxton, and (5) Allen Pond Partners. *NEWN App.* at 282.   Although Beacon had made significant investments in MainePCS, Mr. Salmasi was not a member of the board of managers. *Id.*

Under MainePCS's operating agreement, the vote of two of the three managers—Messrs. Parsloe, Barrette, and Cunningham—constituted the act of the board of managers. *Id.* at 279.   Mr. Parsloe developed an acrimonious relationship

[8] For these propositions, Beacon cites its appendix at pages 52 and 208.   Page 52 is part of NEWN's Complaint in the Bankruptcy Court; page 208 is part of Thomas Barrette's March 25, 2011 testimony before the Bankruptcy Court.   Again, the Court does not rule on whether an allegation in a complaint is sufficient to establish a fact.   During Mr. Barrette's deposition, he makes a general reference to Mr. Parsloe's management of MainePCS; however, he does not state that Mr. Parsloe was the MainePCS president and CEO beginning 2005.   Nevertheless, the Court included the statement because the parties do not contest that Mr. Parsloe was the president and CEO during times critical to this appeal.

[9] The Court could not find support for the date Mr. Cunningham became a board member in pages 207-08 of the Beacon appendix.   In the cited testimony, Mr. Barrette confirms that Mr. Cunningham was an original appointee to the Board of Managers but does not say when.   In its submission, NEWN agrees that Mr. Cunningham became a member of the MainePCS Board of Managers and the Court has included the December 2008 date on the assumption that it is correct or, if not, that the exact date is not material.

with MainePCS, which ended on August 31, 2009 when Messrs. Barrette and Cunningham terminated his membership on the MainePCS Board and his employment with MainePCS. *Beacon App.* at 59, 208; *NEWN App.* at 242.

### 3.   MainePCS Files in Chapter 11

On December 10, 2009, after two of its contracts with TMO had been terminated, MainePCS filed a Chapter 11 case in the Bankruptcy Court. *Beacon App.* at 74, 291; *NEWN App.* at 146. In the early days of its case, MainePCS sought and received approval to borrow money from Maxton. *NEWN App.* at 147. NEWN says that this financing was part of a pre-arranged chapter 11 strategy that had been negotiated and approved by Beacon.[10]

On February 23, 2010, NEWN and Mr. Parsloe initiated the Parsloe Litigation against MainePCS seeking a declaratory judgment that they did not usurp a corporate opportunity of MainePCS, that Mr. Parsloe did not owe MainePCS a fiduciary duty after August 31, 2009, and that their competitive activities did not violate any of MainePCS's rights. *NEWN* 215-23. They also alleged that MainePCS interfered with NEWN's prospective business opportunities. *Id.*

MainePCS filed an Answer and Counterclaim dated March 26, 2010 in the Parsloe Litigation, requesting that the Court deny NEWN and Mr. Parsloe's request for declaratory judgment and enter a judgment in its favor for damages and injunctive relief. *Id.* at 66-81. The MainePCS Counterclaim contained five claims

---

[10] NEWN's statement does not contain a record citation, so the Court has included it as NEWN's assertion.

for relief including breach of fiduciary duty and interference with contractual relations. *NEWN App.* at 231-46.  In the Parsloe Litigation, MainePCS asserted that Mr. Parsloe, as the prepetition president and CEO of MainePCS, was actively involved in negotiating contracts with TMO. *Beacon App.* at 75-77.  In the Parsloe Litigation, MainePCS asserted that because of his extensive involvement, Mr. Parsloe had critical knowledge of the value of these contracts as well as an understanding of the importance of the contracts to MainePCS's overall business plan, and the intent and ability of MainePCS to execute and effectuate the contracts. *Id.* at 75.  In the Parsloe Litigation, MainePCS also asserted that Mr. Parsloe understood that MainePCS had not satisfied certain payment obligations set forth in the contracts, and there was risk that TMO could terminate the contracts, thereby opening up an opportunity for NEWN and Mr. Parsloe to usurp those opportunities for themselves. *Id.* at 75-76.

### 4.    Disclosure Statement and Plan

On June 22, 2010, MainePCS, the Debtor, filed its Disclosure Statement and a second Amended Plan of Reorganization (Plan) in the Chapter 11 case. *Id.* at 8, 32, 205; *NEWN App.* at 197-214.  Pursuant to the Disclosure Statement and Plan, Beacon and United Express were designated as holders of, *inter alia*, Class One Allowed Security Claims. *Beacon App.* at 17-18, 38-39.  The Plan also provided that upon its Effective Date (September 11, 2010), Beacon and United Express, as secured creditors and holders of Class One Allowed Secured Claims, shall possess allowed secured claims "evidenced by the Senior Secured Notes . . . ." *Id.* at 39.

7

Furthermore, under ¶ 5.7 of the Plan, Beacon and United Express's Senior Secured Notes are to be satisfied (either partially or fully) from the proceeds of the resolution of the Parsloe Litigation. *Id.* at 42.

The keystone of the Plan was Maxton's commitment to make a significant equity investment in MainePCS, one that ostensibly would have allowed MainePCS to get its network "up and running" in the short term. *NEWN App.* at 379-86. In exchange for this commitment, Maxton received more than 80% of the equity in the reorganized company. *Id.*; *Beacon App.* at 10. Thus, the Disclosure Statement and Plan provided that Maxton would fund MainePCS's post-confirmation operations, as well as make the Effective Date payments due under the Plan. *Beacon App.* at 10-12, 39, 41. Under the Plan, Maxton was required to fund MainePCS's post-confirmation operation in an estimated amount of $8,500,000. *Id.* at 10. Those amounts were to be provided in the form of cash infusions, services, and equipment, thereby enabling MainePCS to launch its service offering to TMO based on a wholesale airtime contract. *Id.* The Plan also required that 30 fully equipped wireless base stations be deployed on a turn-key basis by Maxton, and that Maxton pay for the operating expenses until the company was cash flow positive. *Id.* The Plan relieved all existing board members of their positions in MainePCS, and required Maxton to cause Mr. Cunningham and Scott Foley, also an officer of Maxton, to be elected as managers of the reorganized debtor, MainePCS. *Id.* at 43. The Plan provided that Mr. Salmasi would be designated as a manager of the reorganized debtor. *Id.*

The Plan also addressed the Parsloe Litigation.  First, MainePCS, as a reorganized debtor, retained ownership of the claims against the NEWN parties. *NEWN App.* at 205.  Second, the Plan directed any recovery arising out of the Parsloe Litigation (whether through settlement or judgment) to the holder of the "Senior Secured Notes."  *Id.* at 206.  In particular, the Plan provided:

> If the resolution of the Parsloe Litigation is through i) a settlement or ii) in the form of a judgment against Parsloe or Northeast, whether or not Parsloe, Northeast or any of their affiliates remain in business of offering wireless services, any benefits flowing to MainePCS from such a settlement or judgment, whether in the form of cash, note(s), in-kind payment (including contribution of assets) or exchange(s), shall first be applied to pay down the Senior Secured Notes, then to pay down the Class Six Note and shall then be paid to the holders of Series A Units for credit against the Series A Return Amount until such amount has been paid in full.  In the case of in-kind payment(s) or exchange(s), a cash amount shall be attributed to such payment(s) or exchange(s) through independent appraisal or with the consent of the Senior Secured Board Member (as defined below), and paid out to as set forth herein.  Notwithstanding the foregoing, if the consideration for a settlement includes the assignment of any contracts by Northeast such assignment shall not be construed as a benefit flowing to MainePCS.

*Id.* at 206-07.  The Plan provided broad, exclusive jurisdiction in the Bankruptcy Court:

> (e.)   To adjudicate all claims or controversies relating to the claims brought against the Debtor by Northeast Wireless Networks, LLC and the counterclaims brought by the Debtor against Northeast Wireless Networks, LLC and its principals or those acting in concert with it;
>
> (f.)   To make such orders as are necessary and appropriate to construe or effectuate the provisions of the Plan;
>
> ...
>
> (i.)   To adjudicate any and all . . . adversary proceedings . . . pending on the Confirmation Date . . . ;

(j.)     To adjudicate any and all controversies and disputes arising under, or in connection with, the Plan . . . or any controversy or dispute which may affect Debtor's or the Reorganized Debtor's ability to implement or fund the Plan;

(k.)     To hear and determine such other matters as the Bankruptcy Court in its reasonable discretion shall deem appropriate.

*Id.* at 210-11.

The Plan further provided for the execution of an amended operating agreement and the management of the reorganized MainePCS by a board of three managers. *Id.* at 207-09. Maxton was permitted to designate two members and Mr. Salmasi was designated as the third board member. *Id.* at 207. In that capacity, the Plan referred to Mr. Salmasi as the "Senior Secured Board Member." *Id.* Maxton's initial designees were Mr. Cunningham and Mr. Foley, another Maxton employee. *Id.*

The Plan prohibited MainePCS from taking certain specified actions without first obtaining the consent of the Senior Secured Board Member. *Id.* at 209. However, those prohibited actions did not include the settlement of the Parsloe Litigation, even though the Plan was the product of substantial negotiations between MainePCS and Beacon. *Id.* at 101-02. During those negotiations, Beacon was represented by Mr. Salmasi, a sophisticated person with extensive experience in telecommunications industry transactions. *Id.* at 399-400. When Beacon and United Express voted to accept the Plan, they were aware that Maxton would be able to designate two of the three managers. *Id.* at 401-02.

10

### 5. The August 18, 2010 Bankruptcy Court Plan Confirmation

On August 18, 2010, the Bankruptcy Court conducted a hearing on the confirmation of Debtor's Plan. *Beacon App.* at 82-86. Thereafter, on August 27, 2010, the Court issued its Confirmation Order approving MainePCS's Plan. *Id.* The Plan's Effective Date was September 11, 2010. *Id.* at 82-86. The Plan and Confirmation Order provided that on the Effective Date, MainePCS, through funding provided by Maxton, shall pay, among others, the legal fees incurred by Beacon and United Express in connection with the reorganization proceeding. *Id.* at 10-12, 39, 41. That amount is approximately $285,000. *Id.* at 87, 88. Beacon says that upon confirmation of the Plan, MainePCS became a reorganized debtor and was no longer a debtor-in-possession within the meaning of the Bankruptcy Code.

Before the Effective Date, Maxton, based on communications between Messrs. Cunningham and Foley, projected that the Effective Date payments due under the Plan would total over $1,000,000. *Id.* at 87-88. Maxton, however, failed—and continues to fail—to make the necessary funds available to MainePCS to satisfy the Effective Date payments. *Id.* at 117-18, 138-41, 244-47. On September 22, 2010, MainePCS admitted it was in material default under the Plan as a result of the failure to fund the Effective Date payments. *Id.* at 117-18, 138-41, 244-47.

11

### 6.     The Draft Agreement

Following confirmation of the Plan by the Bankruptcy Court, Mr. Barrette drafted an amended and restated operating agreement for MainePCS consistent with the Plan (Draft Agreement). *NEWN App.* at 43. At some point after the confirmation of the Plan, Mr. Foley ceased to be employed by Maxton and, given his departure from the company, Maxton designated a replacement for him on the MainePCS board of managers. *Id.* at 67-68; *Beacon App.* at 234-35. Specifically, Maxton designated Mr. Cunningham and Mr. Barrette as managers in the Draft Agreement. *NEWN App.* at 67-68; *Beacon App.* at 234-35. MainePCS submitted the Draft Agreement to Beacon and United Express for review and execution; however, neither responded. *NEWN App.* at 43-44.

### 7.     The Settlement Agreement and the Application to Compromise

Thereafter, on March 8, 2011, Messrs. Barrette and Cunningham—again without consulting or notifying Beacon, United Express, or Mr. Salmasi—negotiated and entered into the Settlement Agreement with Mr. Parsloe and NEWN with respect to the Parsloe Litigation. *Id.* at 233, 256-58. The Appellees explain that MainePCS was motivated to enter into the Settlement Agreement because of the cost, delay, and uncertainty surrounding the Parsloe Litigation, as well as by concerns over the ability of the NEWN parties to pay MainePCS in the event of success. *Id.* at 31-32.

The Settlement Agreement was contingent upon the Bankruptcy Court finding that MainePCS had authority to enter into such agreement, and provided

12

that MainePCS would release its claims against NEWN and Mr. Parsloe in exchange for payment of $200,000 and mutual general releases.  *Beacon App.* at 99-112; *NEWN App.* at 320-33.   Further, notwithstanding ¶ 5.7 of the Plan, which requires that MainePCS pay Beacon and United Express (and, ultimately, in small part the Plan Trustee), all settlement proceeds received from the settlement of the Parsloe Litigation under the Senior Secured Notes, Beacon says that Mr. Cunningham, Mr. Barrette, MainePCS, and Maxton improperly diverted the $200,000 settlement payment to satisfy Maxton's Effective Date obligation to pay Beacon and United Express's professional fees.  *Beacon App.* at 42, 105-06.

Promptly after entering into the Settlement Agreement, MainePCS sought Bankruptcy Court approval by filing an application to compromise pursuant to 11 U.S.C. § 9019 (the Application).  *NEWN App.* at 247-65.  The Appellants say that at that time, Beacon and United Express had commenced an adversary proceeding seeking, among other relief, an order revoking confirmation of the Plan pursuant to 11 U.S.C. § 1144 based on their contention that the Bankruptcy Court's order confirming the Plan was fraudulently obtained.[11]

### 8.   The March 25, 2011 Bankruptcy Court Evidentiary Hearing

On March 25, 2011, the Bankruptcy Court conducted an evidentiary hearing on the Application to Compromise and whether the Settlement Agreement should be approved.  *Beacon App.* at 188; *NEWN App.* at 1.   The official committee of

---

[11] The Court frames this proposition as the Appellants' assertion because there is no record citation supporting it.

unsecured creditors supported the Application, as did several of MainePCS's creditors. *NEWN App.* at 18-19. The Appellants say that Beacon and United Express were the only creditors opposed to the Application.[12]

At that hearing, Mr. Barrette testified on behalf of MainePCS. *Beacon App.* at 190-234. At the time, Mr. Barrette served as executive vice president and general counsel to MainePCS. *Id.* at 206. Beacon says that he also purported to be a manager of MainePCS, having been appointed sometime in early March of 2011.[13] *Id.* at 207. In addition to Mr. Barrette's testimony at the hearing, a March 18, 2011 videotaped trial deposition of Mr. Salmasi was entered in the record. *Id.* at 158-87, 193, 271. The Bankruptcy Court admitted twenty exhibits in evidence.

### 9.    The Bankruptcy Court's March 25, 2011 Ruling

Immediately following the conclusion of the evidentiary hearing, the Bankruptcy Court delivered its oral ruling on the Application to Compromise pursuant to Federal Rule of Bankruptcy Procedure 7052. *Id.* at 276-84; *NEWN App.* at 127. In rendering its decision to approve the Application to Compromise, the Bankruptcy Court found and concluded that MainePCS had exercised appropriate business judgment in executing the Settlement Agreement with NEWN and Mr. Parsloe, pursuant to both Federal Rule of Bankruptcy Procedure 9019 and, on an alternative basis, applicable non-bankruptcy law. *Beacon App.* at 4, 276-84.

---

[12] The Court frames this proposition as the Appellants' assertion because there is no record citation supporting it.

[13] Beacon claims that Mr. Barrette's appointment was without the knowledge or consent of Beacon, United Express, or Mr. Salmasi. *Beacon Br.* at 22. In support of this assertion, Beacon cites Mr. Barrette's March 25, 2010 testimony on page 207 of its appendix; however, there is no support for this assertion on that page. The Court has not included it in its recitation of facts.

More specifically, the Bankruptcy Court rejected Beacon's argument that Maxton was unable to designate Mr. Barrette as a manager because the Draft Agreement was never executed, citing Beacon's failure or refusal to execute a document required by the Plan, namely the Draft Agreement. *NEWN App.* at 127. To the extent that Mr. Barrette was not a manager of MainePCS when the Settlement Agreement was executed, the Bankruptcy Court found that Messrs. Cunningham and Barrette ratified the Settlement Agreement after its execution but before the start of the hearing. *Id.* at 119-20. The Bankruptcy Court found that the Settlement Agreement was also ratified by MainePCS by filing and prosecuting the Application. *Id.* at 120.

In approving the Application, the Bankruptcy Court applied Federal Rule of Bankruptcy 9019. *Id.* at 115-17. The Bankruptcy Court independently reviewed the four factors articulated by the First Circuit Court of Appeals in *Jeffrey v. Desmond*, 70 F.3d 183 (1st Cir. 1995): (1) MainePCS's likelihood of success in the Parsloe Litigation; (2) the complexity of the Parsloe Litigation and the expense, inconvenience, and delay attending it; (3) the difficulties in collecting from the NEWN parties; and (4) the reasonable interests of MainePCS's creditors. *NEWN App.* at 116-17.

On the first factor, the Bankruptcy Court found that MainePCS gave "very considered assessment of the likelihood of [its] success" in the Parsloe Litigation and that the Parsloe Litigation was "hotly contested." *Id.* at 62-63, 117-18. The Bankruptcy Court also found that "it would be a difficult, not necessarily

impossible, task to lay [MainePCS's] failures at the feet of Parsloe and NEWN, disregarding the Debtor's own defaults." *Id.* at 118.

On the second factor, the Bankruptcy Court found that "today speaks for itself that the litigation would be expensive and complex and likely would take a long time before anything would be liquidated and collected." *Id.*

On the third factor, the Bankruptcy Court found that "Mr. Barrette's testimony . . . is based on what appears to me to be a very considered assessment of . . . the likelihood of collection . . . ." *Id.* at 117-18. The Bankruptcy Court found that "the attempted compromises [between MainePCS and the NEWN parties] in the past would confirm, together with [Mr. Barrette's] testimony, the difficulty of collection if [the Parsloe Litigation] were litigated to an end . . . ." *Id.* at 118.

On the final factor, the Bankruptcy Court took judicial notice of the support offered by the creditors of MainePCS for the Application:

> Mr. Fagone:  [T]here are a number of creditors who filed statements of support on the record --
>
> The Court:  Yup.
>
> Mr. Fagone:  -- and those have been admitted but I think they should probably at least be taken judicial notice of and those are a written consent by Oxford [Telephone] who appeared briefly this morning through counsel and then a response filed by David Needham and other holders of claims against the Debtor . . . .
>
> The Court:  Okay.  Thank you.  So noted . . . .

*Id.* at 108.

Balancing all of these factors, the Bankruptcy Court concluded that "for all those reasons I find and conclude that judged under the standards the Circuit says

appropriate . . . that this passes muster and would be approved . . . ." *Id.* at 120. In approving the Application, the Bankruptcy Court also rejected Beacon's proposed application of Rule 9019 factors:

> [The contentions] that [the settlement] destroys the business plan or that it benefits only NEWN and Parsloe, Maxton and Kevin Cunningham are based on that rose-colored view of Mr. Salmasi that, yeah, in contrast to winning everything forever and collecting it all and pinning the other side to the mat hopelessly and forever, yeah, it's not as good a deal as that but that's the essence of compromise.

*Id.* Alternatively, to the extent that the Rule 9019 standard did not apply to the approval of the Application, the Bankruptcy Court also approved the Application as an exercise of MainePCS's "post-petition . . . exercise of judgment." *Id.* The Court found that:

> An alternative analysis would be considering the Debtor's exercise— the post-petition Debtor's exercise of judgment which is unregulated and much greater . . . . In that respect there's really nothing for me to say except the Debtor with authority has decided to settle the matter and that's the end of it. So whether I view this under the sort of the ongoing bankruptcy or the post-Confirmation lens it passes muster . . . . I would also say that the provisions of the Plan that I noted previously give me jurisdiction to say if questioned, yeah, this is fine.

*Id.* at 120-21. On March 30, 2011, the Bankruptcy Court entered an Order approving the Application and the Appellants are now appealing that Order.

## II.   THE PARTIES' POSITIONS

### A.   Beacon's Position

#### 1.   MainePCS Lacked Authority Under Delaware Law to Enter Into and Execute the Settlement Agreement

Beacon first contends that MainePCS "lacked the legal authority to enter into and execute the Settlement Agreement because under Delaware law, in the absence

of an executed operating agreement for the reorganized debtor, only MainePCS's *members* could authorize the execution of the Settlement Agreement." *Beacon Br.* at 14 (emphasis in original). Here, Beacon says, "only two of MainePCS's *managers*, Cunningham and Barrette (and in Barrette's case, only belatedly and impermissibly) signed the Settlement Agreement." *Id.* Beacon maintains that under Delaware law, because the Settlement Agreement did not have member approval, it "was (and is) void." *Id.*

> ## 2. The "Business Judgment" Rule Did Not Apply Because of Maxton's and Mr. Cunningham's Actual Conflicts and the Bankruptcy Court Should Have Applied the "Entire Fairness" Standard to Its Review of the Settlement Agreement

Beacon points out that Mr. Cunningham "was a manager and president of MainePCS, as well as the president, CEO, and majority owner of Maxton." *Id.* Maxton "held the majority equity interest in MainePCS, and Cunningham possess[ed] the largest financial stake in Maxton." *Id.* at 14-15. Beacon alleges that Mr. Cunningham "structured the Settlement Agreement with NEWN and Parsloe so that the $200,000 in settlement proceeds would go to satisfy Maxton's Effective Date obligations to Beacon and United, and not to satisfy the Senior Secured Notes as required under the Plan—all of which benefited Maxton and Cunningham." *Id.* at 15. Beacon also claims that Mr. Cunningham "knew that if MainePCS settled its litigation with NEWN and Parsloe, then NEWN and Parsloe would be free to pursue their wireless service business and NEWN would retain Maxton to do its site build-out and construction work." *Id.* Based in part on these facts, Beacon

18

maintains that Mr. Cunningham and Maxton had conflicts of interest and that the Settlement Agreement should have been held to the more rigorous fairness standard and should not have been approved. *Id.*

### 3. The Exclusion of Mr. Salmasi and the Appointment of Thomas Barrette Violated Delaware Law

Beacon next asserts that Messrs. Cunningham and Barrette "intentionally and improperly excluded, and provided no notice to, Salmasi, as nominal manager of MainePCS, from any deliberation or input with respect to the propriety or appropriateness of entering into the Settlement Agreement with NEWN and Parsloe." *Id.* Furthermore, Beacon says that Mr. Cunningham "lacked the legal authority" under Delaware law "to appoint Barrette a manager of MainePCS in the first instance." *Id.* Beacon claims that these state law violations render the Settlement Agreement void *ab initio.* *Id.*

### 4. Even If The Business Judgment Rule Applies, MainePCS Abused The Rule

Beacon's main point is that the Settlement Agreement had the effect of destroying MainePCS's post-confirmation business and benefiting NEWN, its competitor. *Id.* Beacon observes that Mr. Parsloe "possessed intimate knowledge of MainePCS's business plan and was the lead person in dealing with all suppliers, trade vendors, service providers and, more importantly, key customers such as TMO." *Id.* at 15-16. Similarly, MainePCS says that Mr. Cunningham's loyalties were with Maxton, not MainePCS. *Id.* at 16. Accordingly, Beacon argues that MainePCS was not represented by individuals who could exercise appropriate

19

discretion in settling the Parsloe Litigation. *Id.* MainePCS points to what happened after the Bankruptcy Court's approval of the Settlement Agreement: MainePCS's Chapter 11 case converted to Chapter 7 and its business and assets are being liquidated. *Id.*

**B.    NEWN's Response**

**1.    MainePCS's Authority Under Delaware Law**

NEWN rejects the contention that MainePCS did not have the authority to act under Delaware law and NEWN further argues that, in any event, the Bankruptcy Court Order confirming the plan preempts applicable state law. *NEWN Opp'n* at 18-22.

**2.    The Business Judgment Test Was Appropriate and the Same Result Would Obtain Under the Entire Fairness Standard**

NEWN contends that Beacon failed to cite any applicable legal authority for the proposition that the "entire fairness" standard applies when a Bankruptcy Court approves a compromise under Rule 9019. *Id.* at 22-23. Moreover, NEWN says that if the "entire fairness" standard applies, Beacon failed to demonstrate that Mr. Cunningham and Maxton were not disinterested and that the Bankruptcy Court, having heard the competing testimonies of Mr. Barrette and Mr. Salmasi, found Mr. Barrette's testimony more credible, a finding that should not be disturbed on appeal. *Id.* at 23-24.

> 3. **Delaware Law Does Not Prohibit the Appointment of Thomas Barrette and in Any Event, the Bankruptcy Court's Confirmation of the Plan Preempted General State Law**

NEWN challenges Beacon's contention that section 18-404(d) of the Delaware Code prevents Maxton's designation of Mr. Barrette as a manager. *Id.* at 20-21. It says that the Delaware statute that Beacon cites "begs the question" of whether Maxton's designation was a matter that had to be voted on by MainePCS managers. *Id.* at 21. NEWN argues that Maxton was authorized to appoint MainePCS managers by the Bankruptcy Court, when the Court confirmed the Plan. *Id.*

> 4. **The Bankruptcy Court Did Not Abuse Its Discretion**

NEWN addresses Beacon's overall contention that the Bankruptcy Court abused its discretion when it approved the proposed compromise under Rule 9019. *Id.* at 12-17. NEWN argues that, to the contrary, he Bankruptcy Court properly applied the *Jeffrey* factors and made a careful evaluation of each factor before arriving at its proper and defensible conclusion. *Id.*

## III. DISCUSSION

### A. Standard of Review

"Review of the Bankruptcy Court order on appeal before [the District Court] is governed by Rule 8013 of the Federal Rules of Bankruptcy, which provides a District Court 'may affirm, modify or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." *In re Wolverine, Proctor & Schwartz, LLC*, 436 B.R. 253, 260 (D. Mass. 2010). "[W]hen a party chooses to appeal a bankruptcy court decision to the district court pursuant to 28

U.S.C. § 158(a), the district court reviews the bankruptcy court's conclusions of law *de novo*." *Braemer v. Lowey*, No. 08-cv-349-P-S, 2009 U.S. Dist. LEXIS 14426, at *1-2 (D. Me. Feb. 24, 2009) (citing *Davis v. Cox*, 356 F.3d 76, 82 (1st Cir. 2004); *In re Watman*, 301 F.3d 3, 7 (1st Cir. 2002)).   "In accordance with Federal Rule of Bankruptcy Procedure 8013, the Bankruptcy Court's findings of fact will not be set aside 'unless clearly erroneous.'"  *Braemer*, 2009 U.S. Dist. LEXIS 14426, at *1-2 (quoting FED. R. BANKR. P. 8013).   Where a mixed question of law and fact is presented, the Bankruptcy Court's Order is "reviewable for clear error unless the bankruptcy court's analysis was based on a mistaken view of the legal principles involved."  *In re Merrimac Paper Co.*, 420 F.3d 53, 58 (1st Cir. 2005) (internal punctuation omitted); *see also In re Indep. Eng'g Co.*, 197 F.3d 13, 16 (1st Cir. 1999).

In reviewing the Bankruptcy Court's order approving a compromise and settlement agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 and 11 U.S.C. § 105(a), the District Court tests the Bankruptcy Court's findings of fact for clear error and assesses its conclusions of law *de novo.  Jeffrey*, 70 F.3d at 185. The First Circuit observed, however, that "[t]he approval of a compromise is within the sound discretion of the bankruptcy judge . . . and [an appellate] court will not overturn a decision to approve a compromise absent a clear showing that the bankruptcy judge abused her discretion."  *Id.*  "The cask which encases a judge's discretion, though commodious, can be shattered when a reviewing tribunal is persuaded that the trial court misconceived or misapplied the law, or misconstrued

22

its own rules." *Id.* (quoting *Aggarwal v. Ponce Sch. of Med.*, 745 F.2d 723, 727 (1st Cir. 1984)).

### B.    Abuse of Discretion

The Court starts with whether the Bankruptcy Court abused its discretion in approving the Settlement Agreement because this analysis places the remaining legal issues in context.

### 1.   MainePCS According to Allen Salmasi

It is easy to understand why Allen Salmasi is upset. Even though he is a sophisticated and successful businessman, Mr. Salmasi, his brother-in-law, and their families loaned MainePCS over $7,000,000 and they now stand to lose much of this small family fortune. If this were merely another story of a business with promise hitting hard financial times and following a death cycle beginning with losing valued executives, continuing with a Chapter 11 filing, and ending in a Chapter 7 liquidation, the tale would be evocative but legally unavailing. This story, however, is a tale with a few twists.

At its root, Mr. Salmasi's complaint is that the people who owed MainePCS a duty of loyalty played a double game and ditched MainePCS to enrich themselves either by directly competing with MainePCS or by currying favor with MainePCS's competitors. In Mr. Salmasi's eyes, the first culprit is Robert J. Parsloe, the one-time president and CEO of MainePCS. As Mr. Salmasi sees it, after an acrimonious parting on August 31, 2009 with MainePCS, Mr. Parsloe immediately founded NEWN to compete with his former employer and, what's worse, used his intimate

knowledge of MainePCS's operations, business plans, and contracts to do so unfairly.  Mr. Parsloe and NEWN struck preemptively by requesting a declaratory judgment that they were not violating any fiduciary or contractual obligations to MainePCS and demanding that MainePCS stay out of their way.  In response, MainePCS counterclaimed against Mr. Parsloe and NEWN, asserting that indeed Mr. Parsloe was using inside knowledge to harm MainePCS and asking for the court to enjoin him and NEWN from doing so.  Known as the Parsloe Litigation, the lawsuit had the earmarks of sophisticated and determined legal warfare.  Whatever might have been said about the Parsloe Litigation, as time went on and MainePCS's future became dimmer, the chance of success was becoming one of MainePCS's last hopes and by Mr. Salmasi's reckoning, a valuable asset.

Enter Kevin Cunningham and Maxton.  As an engineering and construction company for the telecommunications industry, neither Mr. Cunningham nor Maxton presumably care whether they work for MainePCS, NEWN, or another FCC-licensee.  However, they do care if they work.  Thus, when Maxton (owned by Mr. Cunningham) offered to invest millions of dollars in MainePCS and help launch it out of bankruptcy, this must have been good news for Mr. Salmasi, who—though a secured creditor of MainePCS—must have been feeling vulnerable.  Maxton's rescue came at a steep price: 80% of the equity of MainePCS and board of manager memberships for Mr. Cunningham and his ally Mr. Foley.  At the same time, Mr. Salmasi and his family still had over seven million dollars at risk so he agreed to join the MainePCS board of managers.  Also, the Plan, which the Bankruptcy Court

approved, contemplated that if MainePCS settled the Parsloe Litigation, the money would first be applied to the Senior Secured Notes: Mr. Salmasi and family.

Here, the third player re-enters, or more precisely remains: Thomas J. Barrette, Jr.  Mr. Barrette was one of the original members of MainePCS and had stuck with the board throughout these events.  When Mr. Foley left Maxton in January 2011, the MainePCS board of managers had dwindled to Mr. Cunningham, Mr. Barrette and Mr. Salmasi.  Mr. Salmasi contends that Mr. Cunningham and Mr. Barrette, as members of the MainePCS board of managers, froze him out and negotiated a resolution of the Parsloe Litigation without informing him.  More to the point, they settled for a mere $200,000 and to add injury, diverted even this money to satisfy Maxton's obligations to pay Beacon and United's attorney's fees. The result from Mr. Salmasi's perspective is that MainePCS was brought to its financial knees, making its liquidation inevitable.

Mr. Salmasi sees Mr. Cunningham, Maxton and Mr. Barrette as violating their most basic legal obligations to MainePCS.  He points to a number of conflicts, including among other things the potential that Maxton will emerge as a decided friend of NEWN and will benefit contractually from the warm glow from Mr. Parsloe for settling the nettlesome Parsloe Litigation cheap and driving his former employer and bitter rival out of business for good.  The list of Mr. Salmasi's concerns goes on.

On March 25, 2011, the lawyers gathered at Bankruptcy Court to see what the Bankruptcy Judge made of all of it.  The Bankruptcy Judge heard testimony,

reviewed exhibits, and pronounced a decisive victory for NEWN.  To satisfy his family's senior secured notes, Mr. Salmasi now faces the grim prospect of meager returns from a court-directed fire sale of MainePCS's assets.

### 2.   The Bankruptcy Order

Alleged machinations aside, the critical question is whether the Settlement Agreement for the Parsloe Litigation should have been approved.  If the terms of the Agreement pass muster, the hidden or apparent agendas of the negotiators do not matter.  Moreover, although Mr. Salmasi's $7,000,000 perspective as MainePCS's major secured creditor is entitled to consideration, his interests do not necessarily trump the validity of the proposed settlement.  *See Jeffrey*, 70 F.3d at 185 (listing "the paramount interest of the creditors" as one of four factors).

From the Court's perspective, the Bankruptcy Court's detailed and even-handed review of the terms of the Settlement Agreement dispels any contention that the Bankruptcy Court abused its discretion in approving the Agreement.[14] *Beacon App.* at 276-84.  The Bankruptcy Judge began by delineating the Court's authority to approve the settlement and the standards under which the Court's approval is gauged.  *Id.* at 277-78.  Citing *Jeffrey* and *Yacovi v. Rubin & Rudman, L.L.P. (In re Yacovi)*, 411 Fed. Appx. 342 (1st Cir. 2011), the Bankruptcy Judge set forth the four *Jeffrey* factors: (1) the probability of success in the litigation being compromised; (2) the difficulties, if any, to be encountered in the matter of

---

[14] The Bankruptcy Court's careful explanation of its reasoning more than meets the need for the court approving the settlement to provide its rationale "in sufficient detail [such] that a reviewing court [can] distinguish it from mere boilerplate approval of the trustee's suggestions."  *In re Boston & Providence R.R. Corp.*, 673 F.2d 11, 12 (1st Cir. 1982) (internal punctuation omitted).

collection; (3) the complexity of the litigation involved and the expense, inconvenience, and delay attending it; and (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premise. *Beacon App.* at 278-79.  The Judge also observed that in *Yacovi*, the First Circuit had written that the standard for evaluating a proposed settlement is to determine whether it falls within the "span of reasonableness" and that the settlement "may not be the most reasonable and it can be, basically, the least reasonable as long as it's within reason." *Beacon App.* at 278.

Skipping for the moment whether the *Jeffrey* factors should have been applied, this Court concludes that the Bankruptcy Court correctly identified those factors and the First Circuit's guidance on the standards for approval.  *See Jeffrey*, 70 F.3d at 185 (listing the four standards); *Yacovi*, 411 Fed. Appx. at 346 *(responsibility of bankruptcy judge and of reviewing court is to "see whether the* settlement falls below the lowest point in the range of reasonableness").

The Bankruptcy Court addressed the first two factors: probability of success and collection.  *Beacon App.* at 279.  The Bankruptcy Court, having heard the testimony of Mr. Barrette and Mr. Salmasi, addressed the "kernel of this dispute," namely the defaults of the TMO leases, and concluded that "it would be a difficult, not necessarily impossible, task to lay those failures at the feet of Parsloe and NEWN, disregarding the Debtor's own defaults." *Id.* at 280.  The Bankruptcy Court accepted Mr. Barrette's "considered assessment of the likelihood of success as well as the likelihood of collection," and characterized as "rose-colored" the view that

MainePCS would be able to "win[] everything forever and collect[] it all and pin[] the other side to the mat hopelessly and forever." *Id.* at 279-80, 282.

Regarding the third factor—complexity of the litigation and expense, inconvenience, and delay—the Bankruptcy Court observed that "today speaks for itself that the litigation would be expensive and complex and likely would take a long time before anything would be liquidated and collected." *Id.* at 280.

Regarding the creditors' interests and views, the Bankruptcy Court discounted Mr. Salmasi's perspective because it was based on the assumption that "we're doing 100 percent on everything and can collect everything and get every ounce of redress," which the Bankruptcy Court later characterized as antithetical to the "essence of compromise." *Id.* at 281-82. Furthermore, as the Bankruptcy Court had previously noted, creditors other than Mr. Salmasi had filed statements of support for the compromise on the record. *NEWN App.* at 108.

Finally, the Bankruptcy Court expressly found that the compromise sum of $200,000 was "fair and sustainable." *Beacon App.* at 282-83; *NEWN App.* at 120-21.

Applying the "manifest abuse of discretion" standard, this Court readily concludes that the Bankruptcy Court's approval of this settlement did not constitute an error of law and was not based on clearly erroneous findings of fact. Beacon's attack on the Bankruptcy Court's approval relies heavily on the persuasiveness of Mr. Salmasi's testimony before the Bankruptcy Court. *Beacon Br.* at 38-40 (recounting Mr. Salmasi's testimony). Yet the Bankruptcy Court, not this Court, had the advantage of assessing the persuasive force and credibility of both Mr.

Salmasi and Mr. Barrette's testimony and adopted Mr. Barrette's "considered assessment." *Beacon App.* at 279-80. As to Beacon's main contention—that it was NEWN and Mr. Parsloe who were responsible for MainePCS's inability to fulfill its TMO contracts—the Bankruptcy Court was openly skeptical that MainePCS's failure to pay was caused by anyone other than MainePCS's "own defaults." *Beacon App.* at 280. Mr. Cunningham's lack of involvement in MainePCS's day-to-day operations, his own interest in Maxton, and his default on his own obligations to MainePCS all warranted a careful assessment of the merits of the settlement proposal. The Bankruptcy Court gave the proposal such an assessment. In the end, the Bankruptcy Court's appraisal of the reasonableness of the settlement rested on the underlying force of MainePCS's case against Mr. Parsloe and NEWN, the complexity and delay of this hotly contested litigation, and the likelihood that any final judgment would be collectible.

From this Court's perspective, Beacon's vigorous attack on the Bankruptcy Court's approval rests more on factors external to the merits of the settlement than on the settlement terms themselves. For example, the bottom line of the Bankruptcy Court's approval is the amount of the settlement, which the Bankruptcy Court expressly found reasonable. Beacon dismisses the $200,000 settlement figure as a "pittance." However, here, the settlement figure was not based on a mathematical computation of acknowledged damage and instead was based on largely subjective assessments, such as the likelihood of success and collection. To successfully demonstrate that the Bankruptcy Court's factual finding

was "clearly erroneous" or amounted to an error of law, Beacon has to do more than gripe. Other than assailing the $200,000 figure as too low, Beacon has not proposed what the correct figure should have been and why its figure should have been accepted.[15] This Court carefully reviewed the Beacon submissions and found no alternative basis for valuing the Parsloe Litigation or for concluding that the Bankruptcy Court erred in finding that $200,000 was, in fact, reasonable. This omission by Beacon is critical because if the Bankruptcy Court was correct in finding that the $200,000 settlement figure was reasonable, the rest of Beacon's earnest contentions about conflicts of interest make no practical difference.

Beacon's main point is really that the $200,000 settlement amount is paltry in comparison to the $7,000,000 in outstanding loans from the Salmasi family. *Beacon Reply* at 1 ("[t]he Settlement Agreement was fundamentally unfair because every single relevant interested party in the Chapter 11 case, *i.e.*, MainePCS and all its creditors, suffered financially from the approval of the Settlement Agreement"). But the amount of the Salmasis' exposure is not directly related to the merits of the Parsloe Litigation. The Bankruptcy Court was required to make a clear-eyed evaluation of the value of the Parsloe Litigation and did so. Though distinctly unhappy with the result, Beacon presents no reasonable basis for this Court to conclude that the Parsloe Litigation was actually worth any other figure.

---

[15] In its objection to the application to compromise, Beacon referred to a September 2010 offer from MainePCS to settle the Parsloe Litigation for $250,000 in cash from NEWN, 1,500,000 in Common A Units of NEWN, 625,000 in Common B Units of NEWN, and $196,000 from NEWN to Maxton for interim financing. *Beacon App.* at 139 (*Beacon Invests. LLC and United Express Wireless, Inc.'s Objection to App. to Compromise Claims* at 2). But Beacon did not mention this demand in its appeal, a party's settlement demand is not necessarily the same as the reasonable value of settlement, and the Court has no basis to conclude how MainePCS arrived at its demand.

In sum, this Court cannot conclude that the Bankruptcy Court's evaluation of the merits of the settlement was wrong.

### C.    The "Entire Fairness" Rule

Beacon contends that the Bankruptcy Court erred in applying the business judgment standard to this case. *Beacon Br.* at 27-31. Rather, because of Mr. Cunningham's and Maxton's "lack of disinterestedness," Beacon says the proper standard should have been the "more rigorous 'entire fairness' standard." *Id.* at 27. Beacon turns to state corporate law, which provides that when a corporate director breaches fiduciary duties, the director is no longer entitled to "the business judgment rule's protection" and the director must show "that a transaction was fair." *Id.* (quoting *Baldwin v. Bader*, 585 F.3d 18, 22 (1st Cir. 2009). Beacon says that there was "substantial evidence before the Court that Cunningham and Maxton were not disinterested fiduciaries." *Id.* at 28. Beacon maintains that once it made this *prima facie* showing, the business rules did not apply and the burden shifted to Mr. Cunningham and Maxton to demonstrate that the transaction was "entirely fair." *Id.* Beacon says that the record is devoid of evidence regarding the circumstances surrounding the execution of the Settlement Agreement and that this absence of evidence should have been fatal to the Application to Compromise. *Id.* at 31.

NEWN responds that Beacon failed to raise this issue before the Bankruptcy Court and therefore waived it. *NEWN Opp'n* at 1, 23 n.9. NEWN further argues that the "entire fairness" standard does not apply to a Rule 9019 application for

compromise. *NEWN Opp'n* at 23. Finally, NEWN says that all of the case law Beacon cites is relevant to *post hoc* litigation as to whether to hold the directors personally liable for a consummated corporate transaction and it argues that on this issue, Beacon and United "will have their day in court to test their 'entire fairness' theory in the proper context." *Id.*

### 1.   Waiver

Having reviewed the record, the Court agrees with NEWN that Beacon failed to raise its current argument that the Bankruptcy Court should apply the entire fairness standard, not the business judgment rule.  In its opposition brief, NEWN raised the issue of waiver and in its Reply, Beacon had an opportunity to point out where in the record it presented this argument to the Bankruptcy Court, but it failed to do so.  Beacon did not refer this Court to any portion of the record where it argued to the Bankruptcy Court that it should not apply the business judgment standard and should apply the more rigorous entire fairness standard. *Beacon Reply* at 17-19.

It is true, as Beacon claims, that it argued before the Bankruptcy Court that Mr. Cunningham and Maxton lacked disinterestedness and had conflicts of interest. *Id.* at 17.  But these arguments were in the context of the business judgment rule, not the entire fairness standard. *Beacon App.* at 139 (*Beacon Invests. LLC and United Express Wireless, Inc.'s Objection to App. to Compromise Claims* at 2) ("Debtor is abusing its business judgment and has failed to exercise proper discretion in settling its claims against Parsloe and NEWN").  This is not merely, as

Beacon asserts, a failure to recite some talismanic words before the Bankruptcy Court. *Beacon Reply* at 17-18 ("[w]hile the words "entire fairness" may not have been used, there are numerous examples in the record about conflicts of interest that Maxton and Cunningham held with respect to MainePCS that required application of the higher entire fairness standard"). Even assuming that in arguing for the application of the "entire fairness" standard, Beacon was not required to use the words "entire fairness," Beacon was still required to bring its current contention to the Bankruptcy Court's attention. "It is hornbook law that theories not raised squarely in the [lower] court cannot be surfaced for the first time on appeal." *Curet-Velazquez v. ACEMLA de P.R., Inc.*, 656 F.3d 47, 53 (1st Cir. 2011) (quoting *McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 22 (1st Cir. 1991)). Here, Beacon never gave the Bankruptcy Court the opportunity to consider its entire fairness standard argument and therefore should not be allowed to challenge the Bankruptcy Court's ruling based on arguments it never addressed.

As Beacon notes, the First Circuit has adopted an exception to the "raise-or-waive rule." *B&T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co.*, 382 F.3d 36, 41 (1st Cir. 2004); *see also United States v. Krynicki*, 689 F.2d 289, 291-92 (1st Cir. 1982). But it has cautioned that exceptions should be "few and far between." *Nat'l Ass'n of Soc. Workers v. Harwood*, 69 F.3d 622, 627 (1st Cir. 1995). Generally, the First Circuit limits the exceptions to instances where the appellant "raises an issue of constitutional magnitude which, if meritorious, could substantially affect the appellant, and future defendants." *Castillo v. Matesanz*, 348 F.3d 1, 12 (1st Cir.

2003) (quoting *United States v. La Guardia*, 902 F.2d 1010, 1013 (1st Cir. 1990)) (internal punctuation omitted).  Although this issue is important to the parties to this appeal, it does not raise an issue of such magnitude that the exception should apply.  Furthermore, to fit within this exception, the resolution of the otherwise waived legal issue should be clear and free from doubt.  *See United States v. Parrilla Bonilla*, 648 F.2d 1373, 1386 (1st Cir. 1981); *Krynicki*, 689 F.2d at 292.

Finally, to meet this exception, the First Circuit requires that "the record pertinent to resolution of this issue can be developed no further." *Krynicki*, 689 F.2d at 291.  The Court is not convinced that in this case the record would likely be the same if the entire fairness standard had been squarely raised before the Bankruptcy Court.  Beacon has argued in this Court that once the conflict of the directors was demonstrated, the burden shifted to the directors to demonstrate that the transaction was intrinsically fair.  *Beacon Br.* at 30; *Beacon Reply* at 15-17.  It has also noted that neither Mr. Cunningham nor a Maxton representative testified in the Bankruptcy Court hearing and it seeks to hold that absence of evidence against NEWN.  *Beacon Br.* at 31.  In fact, Beacon criticizes NEWN's "litigation strategy" in failing to present Mr. Cunningham's testimony at the Bankruptcy Court hearing.  *Beacon Reply* at 18.  However, if NEWN had been informed that there was a risk that, if a conflict were established, it would have the burden to demonstrate the fairness of the transaction, it may well have decided to present Mr. Cunningham as a witness.  In short, Beacon may not hide an issue that could well

have affected NEWN's strategic choices and while appealing on the non-disclosed issue, criticize those choices.

In short, the Court does not accept Beacon's contention that the record in this case establishes that Mr. Cunningham and Maxton had a conflict that would call into play the "entire fairness" rule or that the agreement would not, in any event, have met that standard.  The Court concludes that Beacon waived the "entire fairness" standard issue.

### 2.    Application of the "Entire Fairness" Standard

Even if the Court were to take on the issue, the result would not change.  The "entire fairness" standard is a state law exception to the "business judgment" rule. *See Baldwin v. Bader*, 585 F.3d 18, 22 (1st Cir. 2009) (applying Delaware law).  The business judgment rule "provides substantial latitude for the directors' judgment." *Id.*  By contrast, the "entire fairness" rule requires that the directors "show that a transaction was fair."  *Id.*  As the First Circuit observed in *Baldwin*, a preliminary question is whether "the directors acted in bad faith as to [the] transaction or . . . were disloyal in their duty to foster the best interests of the company and its shareholders."  *Id.*  A second question is "fairness"; on this issue, the First Circuit wrote that "Delaware law . . . provides more ambiguous guidance about how fairness is determined and the relationship of fair price to other fairness factors." *Id.*

On this record, Mr. Cunningham's and Maxton's motivations remain unexplained.  Beacon protests that NEWN benefitted from the resolution of the

35

Parsloe Litigation for "a pittance" and, as a consequence of the Bankruptcy Court's approval of the settlement, is now free to exploit MainePCS's trade secrets unburdened by competition from MainePCS, which is being liquidated. Assuming for the moment that NEWN, as a primary MainePCS competitor owned and operated by the embittered Mr. Parsloe, stood to benefit from this settlement, it is less clear why Mr. Cunningham and Maxton would seek to scuttle MainePCS in favor of NEWN. After all, under the Plan, Maxton was required to contribute approximately $8,500,000 in funding and services to MainePCS during its reorganization, and in exchange for its contribution, Maxton was to receive an 80% stake in MainePCS as a reorganized debtor. Even if Maxton defaulted on the first payment of $1,000,000 due on September 11, 2010, the so-called Effective Date payment, the record does not explain why Mr. Cunningham would favor a company he did not own, namely NEWN, over a company that he did, namely MainePCS. Beacon asserts that Mr. Cunningham and Maxton struck the settlement deal in the shadow of the inevitable transformation of the MainePCS Chapter 11 to a Chapter 7; however, it also traces their abandonment of MainePCS to the fall of 2010, long before liquidation was a foregone conclusion.

The evidence in this record that Maxton and Mr. Cunningham actually went into cahoots with NEWN and turned on MainePCS is very scant. During his testimony, Mr. Salmasi testified equivocally that he thought that NEWN would be "getting away with murder" if the settlement were approved and that Mr. Parsloe was engaging in "back-room dealings with Maxton and Mr. Cunningham." *Beacon*

*App.* at 169 (*Salmasi Dep.* 42:3-4; 19-24).   However, Mr. Salmasi had had little contact with Mr. Cunningham and Mr. Salmasi's testimony, however vivid, was directed mostly to the unfortunate consequences of the settlement, not the reasonableness of its underpinnings.   *See Baltimore Ptnrs., L.P. v. Link Energy LLC*, No. 454-N, 2005 Del. Ch. LEXIS 155, at *20 (Del. Ch. Oct. 14, 2005) (concluding that a corporate action that resulted in secured interests being left with no residual value did not call into play the "entire fairness" rule because the directors had not acted "solely or primarily for the express purpose of depriving a shareholder of effective enjoyment of a right conferred by law").

Beacon directed most of its fire at Mr. Cunningham, but the person who testified before the Bankruptcy Court was Mr. Barrette, MainePCS's Executive Vice President and General Counsel since the company started in 2005; Mr. Barrette had served on the board of managers from the beginning until the Chapter 11 petition in December 2009, and had recently been reappointed to the board.   *Beacon App.* at 206 (*Barrette Dep.* 22:19-23:7).   Mr. Barrette said that he is not an equity holder in Maxton, an officer of Maxton, or a director of Maxton.   *Id.* at 207-08 (*Barrette Dep.* 23:24-24-6).   He defended the reasonableness of the settlement, explaining (1) that Kevin Cunningham and he were "concerned about [NEWN's] ability to -- fund a settlement;" (2) that the Parsloe Litigation was going to be a "tough slog;" and (3) that MainePCS had "better uses for what resources we had than litigating."   *Id.* at 242-43 (*Barrette Dep.* 75:21-76:17).   Furthermore, although Beacon accused Mr. Cunningham of essentially abandoning MainePCS in favor of

37

NEWN in the fall of 2010, Mr. Barrette testified that "Kevin was an active, interested manager of MainePCS, very involved in what was going on in every aspect of it." *Id.* at 241 (*Barrette Dep.* 74:23-24).

For whatever reason, the parties decided not to present the testimony of Kevin Cunningham, leaving the Bankruptcy Court with a choice between the testimony of Mr. Salmasi and that of Mr. Barrette. On this record, the Court cannot conclude that the Bankruptcy Court erred in accepting Mr. Barrette's testimony. *NEWN App.* at 127 ("I credit [Mr. Salmasi's] view but I find it unpersuasive"). Despite Beacon's sharply-worded grievances against Mr. Cunningham, the case against Mr. Barrette is more attenuated and the settlement would not have been approved without his acquiescence. In sum, the record before the Court does not indicate that the settlement agreement violated the entire fairness rule.

In short, the Court does not accept that the record in this case establishes Beacon's main contention that Mr. Cunningham and Maxton had a conflict that would call into play the "entire fairness" rule or that the agreement would not, in any event, have met that standard.

### D.    MainePCS's Authority to Enter the Settlement Agreement

Beacon's next contention is that Messrs. Cunningham and Barrette lacked the legal authority to enter into a settlement agreement on behalf of MainePCS. This argument has two facets: first, that Mr. Barrette was never legally named as a manager of MainePCS and therefore could not legally consent to the settlement;

and second, that Mr. Cunningham and Mr. Barrette violated corporate law by failing to consult Mr. Salmasi, the third manager.

Beacon's position on the first issue takes some explaining.  On August 27, 2010, the Bankruptcy Court approved MainePCS's Plan with an Effective Date of September 11, 2010 and pursuant to that Plan, MainePCS's then existing managers were relieved of their duties and a new board of managers, consisting of Mr. Cunningham, Mr. Foley, and Mr. Salmasi, was established.  Sometime in January 2011, Mr. Foley left Maxton and no longer had a role in MainePCS.  On March 8, 2011, Mr. Cunningham signed the settlement agreement as a member but Mr. Barrette signed only as a corporate officer.  On March 14, 2011, Beacon questioned Mr. Barrette's authority to act and on March 22, 2011, Messrs. Cunningham and Barrette executed a written consent of managers approving and ratifying their signatures on the settlement agreement.  Beacon says that there was never any documentation confirming that Mr. Barrette was ever properly named a member of MainePCS and, as no one consulted with Mr. Salmasi, the appointment is void under Delaware law and hence MainePCS never legally approved the settlement.

There are several problems with Beacon's argument.  First, under Article 7.1 of the Plan, which was approved by the Bankruptcy Court, the board of managers consisted of three persons, "a majority of whom shall be designated by Maxton." *Beacon App.* at 43 (*Debtor's Second Am. Plan of Reorganization Dated June 22, 2010* at 11).  The Plan states that "Maxton's initial designees shall be Kevin J. Cunningham and Scott Foley."  *Id.*  The Plan contemplates that Maxton has the

right to make subsequent designations, as it did when it named Mr. Barrette as manager. This Court rejects Beacon's contention that MainePCS was not bound by the terms of the Plan. 11 U.S.C. § 1141(a) ("the provisions of a confirmed plan bind the debtor").

Furthermore, as the Bankruptcy Court observed, MainePCS was the party moving for approval of the settlement and by doing so, ratified the actions of its members. *See Beacon App.* at 99-103; 281-82 ("I find as fact, based on my assessment of the evidence, that the Debtor, post-petition through Mr. Barrette and Mr. Cunningham, negotiated a settlement of this matter with authority on behalf of the Debtor with two of the three managers that, albeit Mr. Barrett[e]'s formal appointment to the Board of Managers was after the fact, it was ratified and further ratified by the Debtor prosecuting this matter through to completion today").

Nor does the Delaware Code mandate a different result. Beacon argues that the Delaware statute controls the legality of the settlement agreement, absent a provision in "a limited liability company agreement." *Beacon Br.* at 241; *Beacon Reply* at 10-11 (citing 6 DEL. C. § 18-402). Under section 18-402, Beacon maintains the management of the LLC "shall be vested in its members" and since only its "managers" and none of MainePCS's "members" signed the settlement agreement, the agreement is void. *Beacon Br.* at 24-25; *Beacon Reply* at 11.

But Beacon's argument ignores the Plan, which MainePCS agreed to and which was approved by the Bankruptcy Court. As did the Bankruptcy Court, this Court views the Plan, which sets forth in detail how MainePCS is to be operated, as

40

the "operating agreement" of the LLC within the meaning of section 18-402.  *See*
*Facchina v. Malley*, No. 783-N, 2006 Del. Ch. LEXIS 142, at *4 (Del. Ch. Aug. 1,
2006) (equating the "limited liability company agreement" with an "operating
agreement"); *NEWN App.* at 127 ("this Debtor was not rudderless and without
management for the entire post-Confirmation period and . . . those officers were
qualified and . . . were acting pursuant to the Confirmed Plan of Reorganization").
Indeed, the Plan sets forth in detail "The Operating Agreement" of MainePCS.
*Beacon App.* at 43-45.  Under Delaware statutory law, the management of the LLC
is vested in the members except if the agreement "provides for the management, in
whole or in part, of a limited liability company by a manager" and, if so, "the
management of the limited liability company, to the extent so provided, shall be
vested in the manager who shall be chosen in the manner provided in the limited
liability company agreement."  6 DEL. C. § 18-402.  Here, under Article 7.1, the Plan
expressly established a board of managers.  *Beacon App.* at 43.

Moreover, as Beacon concedes, under Delaware law, the courts strive to
enforce the LLC's agreements.  The Delaware Supreme Court has observed that
"[t]he basic approach of the Delaware Act is to provide members with broad
discretion in drafting the Agreement" and that "[t]he Act is replete with
fundamental provisions made subject to modification in the Agreement."  *Elf*
*Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999).  This Court views
MainePCS's acquiescence to the Plan and its subsequent confirmation by the
Bankruptcy Court as such an enforceable agreement.

Once the authority of Mr. Cunningham and Mr. Barrette to act for MainePCS is established, the last question is whether they were required to consult with Mr. Salmasi or obtain his consent before agreeing to the terms of the settlement.  Here, the Plan placed the governance and management of MainePCS in the hands of three managers.[16]  *Beacon App.* at 43.  The Delaware Code provides:

> Unless otherwise provided in a limited liability company agreement . . . on any matter that is to be voted on, consented to or approved by managers, the managers may take such action without a meeting, without prior notice and without a vote if consented to, in writing or by electronic transmission, by managers having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all managers entitled to vote thereon were present and voted.

6 DEL. C. § 18-404(d).   Once Mr. Barrette was authorized to act as a manager, two out of the three managers had resolved to approve the settlement and therefore the action was consented to "by managers having not less than the minimum number of votes that would be necessary to authorize or take such action."  *Id.*  Because they had the authority to act without Mr. Salmasi's consent, the Court concludes they did not need to seek it.

---

[16] To the extent Beacon contends that there was no operating agreement, Delaware law provides that in the absence of a limited liability company agreement, "the decision of members owning more than 50 percent is controlling."  *Facchina*, 2006 Del. Ch. LEXIS 142, at *4 (quoting 6 DEL. C. § 18-402).  Here, the Maxton interests owned more than fifty percent.  *Beacon App.* at 43.

## IV.    CONCLUSION

The Court affirms the March 30, 2011 Order of the United States Bankruptcy

Court Approving Compromise.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 28th day of March, 2012